IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Judith Stepp, | ) | C/A No.: 1:17-771-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On August 8, 2013, Plaintiff protectively filed an application for DIB in which she alleged her disability began on January 1, 2013. Tr. at 111 and 175–76. Her application was denied initially and upon reconsideration. Tr. at 124–27 and 129–30. On November

6, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") James M. Martin. Tr. at 42–86 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 5, 2016, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–32. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 22, 2017. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 27. She completed the seventh grade. Tr. at 49. Her past relevant work ("PRW") was as a nursing assistant, a cashier and dining cafeteria attendant, a dog catcher, a sewing machine operator, and a hand packer. Tr. at 72–73 and 75. She alleges she has been unable to work since February 22, 2015.[1] Tr. at 46.

2.      Medical History

Plaintiff presented to Mitchell Dillman, M.D. ("Dr. Dillman"), on August 8, 2012, with complaints of right hand pain, swelling in both hands, frequently dropping items, pain and tenderness in her right foot, difficulty walking, and headaches that were accompanied by sensitivity to light and sound. Tr. at 388. She reported that she had

---

[1] During the hearing, Plaintiff's attorney moved to amend Plaintiff's alleged disability onset date to February 22, 2015, to coincide with an agreement with her employer for her to work for no more than four hours at a time. Tr. at 46–47. The ALJ granted the motion. Tr. at 47.

decreased her insulin dosage because she was feeling too hungry. *Id.* Dr. Dillman observed Plaintiff to be obese, weighing 174 pounds and having a body mass index ("BMI") of 36.4. Tr. at 390. He diagnosed acute migraine, type II diabetes mellitus, and right ankle/foot pain. Tr. at 391. He prescribed acetaminophen-isomethpetene-caffeine and Diclofenac, recommended that Plaintiff take the prescribed dose of insulin, and referred her for an orthopedic consultation. Tr. at 391 and 393.

Plaintiff presented to the emergency room ("ER") at Oconee Medical Center on August 15, 2012, with complaints of a migraine headache and nausea that had caused her to sustain two recent falls. Tr. at 273. She reported left ankle pain. *Id.* The attending physician observed swelling in Plaintiff's lateral malleolus. Tr. at 271. A computed tomography ("CT") scan and x-rays showed no abnormalities. Tr. at 275. The attending physician diagnosed migraine headache and ankle sprain. *Id.*

Plaintiff complained of pain in her left hand and right foot on September 11, 2012. Tr. at 396. Dr. Dillman observed that Plaintiff walked with a limp, but had normal ankle range of motion ("ROM"). Tr. at 397. He diagnosed ankle/foot pain and carpal tunnel syndrome, prescribed Pennsaid, and provided a note excusing Plaintiff from work for the day. Tr. at 395 and 398.

Plaintiff underwent left carpal tunnel release surgery on September 13, 2012. Tr. at 340–42.

Plaintiff complained of hypoglycemia on October 16, 2012. Tr. at 400. Dr. Dillman diagnosed moderate hypoglycemia and uncontrolled, chronic back pain and prescribed Cymbalta, Lortab, Metformin, and Symbicort. Tr. at 402–03.

On November 27, 2012, Plaintiff reported that her right foot pain had improved with use of Voltaren gel. Tr. at 406. Dr. Dillman refilled Plaintiff's medications and ordered blood work. Tr. at 406–07.

Plaintiff followed up for diabetes management on February 27, 2013. Tr. at 408. Dr. Dillman indicated that Plaintiff was experiencing weekly episodes of hypoglycemia despite her compliance with treatment. *Id.* Plaintiff reported pain in her hip that was exacerbated by standing for long periods and working. Tr. at 410. Dr. Dillman diagnosed questionable brittle diabetes, hyperlipidemia, hypertension, and hip pain. Tr. at 410–11. He discussed diet and prescribed Crestor, Metformin, and Diclofenac. Tr. at 411. He referred Plaintiff for treatment with a diabetes educator and an ophthalmologist. *Id.*

On May 29, 2013, Plaintiff reported that she had decreased her Levemir dosage to 40 units because her blood sugar was dropping during the night. Tr. at 415. She indicated her blood sugar was elevated 60 percent of the time and was below normal 13 percent of the time. *Id.* She complained of continued pain in her left hip and right heel. *Id.* Dr. Dillman observed Plaintiff to have normal gait and normal strength in her extremities. Tr. at 417. He noted tenderness to the plantar surface of Plaintiff's right foot and along her left iliotibial band. *Id.* He ordered blood work, prescribed Cymbalta and Lortab, and adjusted Plaintiff's diabetes medications. Tr. at 417–18.

On June 28, 2013, Plaintiff reported that she had been checking her blood sugar three to four times each day and had noted two incidents of blood sugar in the 30s and 40s during the prior week. Tr. at 419. She indicated the incidents often occurred when she was working until after 6:00 p.m. and was unable to eat an early dinner. *Id.* She

complained of headaches and pain in her buttocks and the left side of her low back that radiated to her thigh. Tr. at 420. She indicated the pain had not improved with physical therapy. *Id.* Dr. Dillman observed Plaintiff to have multiple paraspinous tender points in her lumbar spine and to be tender to palpation in her left buttock and trochanter. Tr. at 421. He discussed diet and adjustments to Plaintiff's diabetic medications and ordered magnetic resonance imaging ("MRI"). *Id.*

Plaintiff was treated in the ER at Oconee Medical Center for migraine headaches on July 31, 2013, and August 11, 2013. Tr. at 314–15 and 322–24.

Plaintiff followed up with Dr. Dillman for migraine headaches and back pain on August 13, 2013. Tr. at 422. Dr. Dillman ordered x-rays of Plaintiff's hip, administered an injection, and prescribed Ketorolac, Promethazine, and Sumatriptan. Tr. at 423.

Plaintiff presented to neurologist George Baxley on August 15, 2013. Tr. at 351. Dr. Baxley indicated Plaintiff had migraines that were associated with photophobia, phonophobia, pulsatility, and intractability. *Id.* Plaintiff indicated her blood sugar had been fluctuating. *Id.* Dr. Baxley observed her to have intact reflexes, slightly-diminished distal sensation, and 4/5 strength. *Id.* He diagnosed status migrainosus with contribution from exogenous stress, blood sugar fluctuations, and component of rebound. *Id.* He decreased Plaintiff's ibuprofen dosage and prescribed Ultram and Sumatriptan. *Id.*

Plaintiff was again treated for a migraine headache at Oconee Medical Center on August 19, 2013. Tr. at 330–32.

On August 20, 2013, x-rays of Plaintiff's left hip were normal and an MRI of her brain was negative. Tr. at 352 and 354.

Plaintiff complained of throbbing in her right leg and pain in her right ankle on August 27, 2013. Tr. at 424. She indicated the pain radiated down her right leg. *Id.* She also endorsed chronic left leg pain secondary to sciatica. *Id.* Dr. Dillman observed tenderness to Plaintiff's right ankle joint, but noted normal ROM and no muscle weakness. Tr. at 426. He ordered a venous ultrasound to rule out deep venous thrombosis. *Id.*

On September 19, 2013, Dr. Dillman indicated in a mental questionnaire that Plaintiff had no mental diagnosis and was not being prescribed medications for a mental condition. Tr. at 387. He described Plaintiff as appropriately oriented with an intact thought process, appropriate thought content, normal mood and affect, and good attention, concentration, and memory. *Id.* He stated Plaintiff had only slight work-related limitation in function due to a mental condition and was capable of managing her own funds. *Id.*

Plaintiff reported that her right leg pain had improved on September 20, 2013. Tr. at 428. Dr. Dillman observed that Plaintiff did not look well. Tr. at 429. He prescribed Levofloxacin, Prednisone, and Victoza. Tr. at 430.

On October 17, 2013, Plaintiff reported that she continued to experience migraine symptoms, but that her headaches had improved. Tr. at 432. Dr. Baxley noted that the MRI of Plaintiff's brain was normal. *Id.* Plaintiff indicated that she had decreased her ibuprofen intake and that she had experienced fewer fluctuations in her blood glucose levels. *Id.* Dr. Baxley observed Plaintiff to have intact reflexes, slightly diminished distal sensation, and 4/5 strength. *Id.* He diagnosed chronic neuropathy secondary to diabetes,

in addition to the prior diagnoses. *Id.* He prescribed Voltaren gel for neuropathic foot pain, discussed precautions to prevent falls, and refilled Plaintiff's prescription for Sumatriptan. *Id.*

On October 30, 2013, Dr. Dillman noted that Plaintiff's hemoglobin A1c was elevated at 8.4 percent, which was an improvement from 9.4 percent. Tr. at 589. He refilled her medications and ordered lab work. Tr. at 590.

On December 4, 2013, Plaintiff reported that she continued to experience hypoglycemia two to three times per week, but that her blood sugar was often elevated. Tr. at 585. She stated she was tolerating Victoza. *Id.* Dr. Dillman adjusted Plaintiff's medications for diabetes and discussed diet. Tr. at 587. He indicated Plaintiff required intensive diabetes counseling and specialty care that he could not provide and referred her to a diabetologist. *Id.*

State agency medical consultant Seham El-Ibiary, M.D. ("Dr. El-Ibiary"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment on December 11, 2013. Tr. at 94–96. He found that Plaintiff had the following abilities: occasionally lift and/or carry 20 pounds; frequent lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally balancing and climbing ladders, ropes, and scaffolds; avoiding concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and avoiding even moderate exposure to hazards. *Id.* A second state agency medical consultant, Ted Roper, M.D. ("Dr. Roper"), assessed the same RFC on February 26, 2014. Tr. at 106–08.

State agency psychological consultant Camilla Tezza, Ph.D. ("Dr. Tezza"), also reviewed the record on December 11, 2013. Tr. at 94–96. She considered Listing 12.04 for affective disorders and determined that Plaintiff's impairment caused mild restriction of activities of daily living ("ADLs"); mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.*

On January 2, 2014, Plaintiff reported that her blood glucose level had ranged from 90 mg/dL to 130 mg/dL. Tr. at 579. She complained of increased urinary frequency, fatigue, weakness, and back pain. Tr. at 580. Dr. Dillman noted Plaintiff's abdomen was diffusely tender and diagnosed viral gastroenteritis. Tr. at 581.

On February 6, 2014, Dr. Dillman noted that Plaintiff had recently presented to the hospital with a virus. Tr. at 575. Plaintiff continued to feel ill and reported an episode of low blood glucose on the prior morning. *Id.* Dr. Dillman prescribed Hydrocodone and Metformin and authorized Plaintiff to remain out of work until February 10, 2014. Tr. at 577–78.

On April 9, 2014, Plaintiff reported that Dr. Baxley had administered injections to the base of her skull that had been ineffective. Tr. at 572. She complained of headaches and difficulty sleeping. Tr. at 573. Dr. Dillman observed tenderness to palpation of Plaintiff's occipital and parietal areas. *Id.* He diagnosed moderate-to-severe insomnia, in addition to previously-diagnosed conditions and prescribed Cymbalta, Proventil, Symbicort, and Trilipix and a trial of Doxepin. Tr. at 573–74.

On June 4, 2014, Plaintiff complained that medication had not improved her insomnia. Tr. at 569. She reported daily headaches and suspected that they were stress-related. *Id.* She indicated the injections Dr. Baxley administered had only provided minimal relief. *Id.* Dr. Dillman noted no abnormalities on examination. Tr. at 571. He refilled Plaintiff's medications. *Id.*

On August 6, 2014, Plaintiff reported symptoms of grief following her husband's death two months prior. Tr. at 564. She complained of difficulty sleeping, mood swings, anxiety, and impaired concentration. Tr. at 565. Dr. Dillman noted that approximately seven percent of the blood glucose readings in Plaintiff's log reflected hypoglycemia, but that her hypoglycemic episodes had decreased to once a week from two to three times per week. Tr. at 564. He stated Plaintiff appeared mildly ill and anxious. Tr. at 566. Plaintiff's hemoglobin A1c was 8.7 percent. Tr. at 567. Dr. Dillman adjusted Plaintiff's insulin dosage, prescribed Lorazepam, and refilled her other medications. Tr. at 567–68.

On September 18, 2014, Plaintiff reported that she continued to feel nervous and shaky, but that Lorazepam was providing some relief. Tr. at 561. She complained of fluctuations in her blood glucose level and indicated her blood sugar was often low before dinner. *Id.* Dr. Dillman diagnosed chronic, uncontrolled anxiety and uncontrolled type II brittle diabetes. Tr. at 563. He refilled Lorazepam and Paroxetine. *Id.*

Plaintiff complained that Lorazepam was providing no relief on October 30, 2014. Tr. at 557. She reported feeling anxious and being unpleasant with her children. *Id.* She endorsed daily hypoglycemic episodes. *Id.* She complained of pain in her back, joints, and muscles that had worsened since she decreased her dose of Cymbalta. Tr. at 559. She

endorsed difficulty sleeping and concentrating. *Id.* Dr. Dillman observed that Plaintiff did "not look well" and appeared anxious. *Id.* He prescribed Clonazepam and Hydrocodone. *Id.*

Plaintiff was referred to Oconee Medical Center for suicidal ideation on November 13, 2014, after she endorsed suicidal thoughts during a grief counseling session. Tr. at 484. She was hospitalized at Oconee Medical Center through November 15, 2014. Tr. at 488. She was subsequently transferred to Patrick B. Harris Psychiatric Hospital, where she remained until November 19, 2014. Tr. at 440–42. Kathleen O'Leary, M.D. ("Dr. O'Leary"), noted that Plaintiff was a potential danger to herself or others and had failed outpatient treatment. Tr. at 439. She indicated Plaintiff's depression had worsened and she had developed suicidal ideation secondary to psychosocial stressors related to her husband's death. Tr. at 440. She diagnosed major depressive disorder without psychosis, bereavement, poorly-controlled insulin-dependent diabetes, sleep apnea, hypertension, chronic obstructive pulmonary disease ("COPD"), back pain, migraine headaches, hyperlipidemia, and gastroesophageal reflux disease ("GERD") and prescribed Klonopin, Ambien, Prilosec, Cymbalta, Lipitor, Lantus, Lisinopril, and Metformin. Tr. at 441–42. She assessed a global assessment of functioning ("GAF") score[2] of 70[3] at the time of discharge and instructed Plaintiff to follow up for outpatient psychiatric treatment. Tr. at 442.

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF

Plaintiff presented to Amanda L. Varner, M. Ed. ("Ms. Varner"), at Oconee Mental Health for an initial clinical assessment on November 21, 2014. Tr. at 520. She reported seeing visions of her deceased husband. *Id.* She indicated she would start a sentence and neglect to finish it before starting the next sentence and would often forget her actions. *Id.* She complained of difficulty sleeping and indicated she had no motivation or energy. *Id.* Ms. Varner observed Plaintiff to be appropriately oriented, to have a blunted affect and a depressed mood, to demonstrate intact memory and concentration, and to have a below-average fund of knowledge. Tr. at 522–23. She diagnosed depressive disorder, not otherwise specified ("NOS") and assessed a GAF score of 60.[4] Tr. at 523. She recommended Plaintiff follow up for outpatient treatment. *Id.*

Plaintiff followed up with Amr Khalafellah, M.D. ("Dr. Khalafellah"), for psychiatric treatment on November 25, 2014. Tr. at 527. She reported that the increased dose of Cymbalta had been helpful. *Id.* Dr. Khalafellah observed Plaintiff to be cooperative; to have a euthymic mood and an appropriate affect; to demonstrate intact memory, attention, and concentration; to show good insight and judgment; and to have an

---

scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[3] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *DSM-IV-TR.*

[4] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

average fund of knowledge. *Id.* He diagnosed severe, recurrent major depressive disorder without psychotic features and assessed a GAF score of 55. Tr. at 528.

On December 1, 2014, Plaintiff reported that she had felt better since her hospitalization. Tr. at 552. She complained of hypoglycemia. *Id.* Her hemoglobin A1c continued to be elevated at 9.7 percent. Tr. at 556. Dr. Dillman indicated that he would attempt to refer Plaintiff to a diabetes specialist. *Id.*

Plaintiff presented to Dr. Dillman with worsening anxiety and mood swings on January 6, 2015. Tr. at 549. She indicated that she was working a lot and that her back pain had increased. *Id.* She reported visiting a mental health counselor and attending church. *Id.* Dr. Dillman observed that Plaintiff appeared anxious. Tr. at 551. He recommended a book and suggested that Plaintiff seek counseling from her minister instead of taking stronger pain medication. *Id.*

Plaintiff presented to the ER at Greenville Health System on January 25, 2015, for an upper respiratory infection and COPD exacerbation. Tr. at 480. She complained of shortness of breath that occurred when she walked for short distances. *Id.* The attending physician observed mild wheezing, but no signs of respiratory distress. Tr. at 481. He prescribed an antibiotic medication and instructed Plaintiff to follow up with Dr. Dillman. Tr. at 482.

On February 6, 2015, Plaintiff presented to Dr. Dillman with symptoms of acute gastritis. Tr. at 547. Dr. Dillman prescribed Zantac, Clonazepam, Lisinopril, Metformin, Proventil, Ranitidine, and Symbicort. *Id.*

Plaintiff presented to the ER at Greenville Health System on February 22, 2015, after she experienced a syncopal episode while driving and hit a side rail. Tr. at 465. She reported feeling extremely emotional prior to the accident. *Id.* She endorsed a left-sided headache. *Id.* The attending physician diagnosed syncope, advised Plaintiff to follow up with Dr. Dillman, and instructed her not to drive until she was cleared by her primary care physician or a neurologist. Tr. at 468.

On February 26, 2015, an electroencephalogram ("EEG") was normal. Tr. at 460. A carotid ultrasound showed mild bilateral internal carotid artery stenosis that the interpreting physician did not consider clinically significant. Tr. at 463–64.

Plaintiff followed up with Dr. Dillman on March 18, 2015. Tr. at 542. She reported mood swings, anxiety, and depression. Tr. at 544. Dr. Dillman considered hypoglycemia and stress to be potential explanations for Plaintiff's syncopal episode. *Id.* He observed Plaintiff to appear mildly ill and noted that her blood glucose log showed readings from 48 mg/dL to over 400 mg/dL. *Id.* He recommended that Plaintiff be evaluated by an endocrinologist and follow up for mental health treatment. *Id.* He noted that Plaintiff was working a reduced schedule and indicated she should not yet return to driving. *Id.* He acknowledged that Plaintiff was seeking an attorney to assist with her disability claim and stated "I believe she meets criteria on the basis of her brittle diabetes alone." *Id.* He subsequently referred Plaintiff to an endocrinologist on April 3, 2015. Tr. at 611.

Plaintiff complained to Dr. Dillman of hypoglycemia on April 21, 2015, but indicated she had been unable to properly administer a sliding-scale dose of insulin for

several weeks because she had been out of glucose test strips. Tr. at 539. She indicated she had been administering her insulin based on how she felt. *Id.* She complained of fatigue, weakness, and headaches. Tr. at 541. Dr. Dillman observed that Plaintiff did not appear healthy or look well. *Id.* He instructed her to follow up with the endocrinologist as scheduled. *Id.*

Plaintiff presented to Elaine Noonan, NP ("Ms. Noonan"), for an endocrinology consultation on April 22, 2015. Tr. at 605. She reported complications to her feet as a result of neuropathy that included numbness, tingling, and burning. *Id.* Ms. Noonan observed Plaintiff to have normal ROM in her feet and no lesions, but decreased sensation to monofilament testing. Tr. at 607. Ms. Noonan adjusted Plaintiff's diabetes medications. Tr. at 607–08.

On May 6, 2015, Ms. Noonan reviewed Plaintiff's blood glucose log and noted that her readings ranged from a low of 14 mg/dL to a high of 484 mg/dL, but were most often elevated. Tr. at 602. She encouraged Plaintiff to monitor her carbohydrate intake, increased her dosages of Novolog and Levemir, and refilled her other medications. Tr. at 603.

On May 11, 2015, Plaintiff reported continued fluctuations in her blood glucose level despite changes in dosage to Levemir and Novolog. Tr. at 535. She indicated her stress level had decreased, but requested stronger medication for sleep. *Id.* Dr. Dillman instructed Plaintiff to continue to follow up with an endocrinologist and refilled Clonazepam, Cymbalta, Levemir, Lorazepam, and Nexium. Tr. at 537–38.

Plaintiff presented to Kun U. Taro, M.D. ("Dr. Taro"), at Oconee County Mental Health for psychiatric treatment on May 19, 2015. Tr. at 525. She complained of depression, low energy, and poor sleep and indicated Ambien had not been helpful. *Id.* Dr. Taro instructed Plaintiff to slowly increase her dosages of Klonopin and Ambien. *Id.* He also prescribed Remeron and Vistaril and refilled Cymbalta. *Id.* He assessed severe, recurrent major depressive disorder without psychotic features and a GAF score of 50.[5] *Id.* He recommended that Plaintiff engage in psychotherapy. Tr. at 526.

Plaintiff complained of back pain, mood swings, and anxiety on July 21, 2015. Tr. at 531. She indicated she had problems with her "nerves," was "not doing well," and was being "snappy" with her children. *Id.* She indicated she had not yet been able to fill the medications Dr. Taro had prescribed. *Id.* She continued to endorse problems with diabetes, but reported fewer incidents of hypoglycemia. *Id.* Her hemoglobin A1c was 7.9 percent. Tr. at 533. Dr. Dillman prescribed Xanax for anxiety. Tr. at 534.

On August 19, 2015, Plaintiff reported to Ms. Noonan that she had recently received trigger point injections for her headaches. Tr. at 641. She complained of significant stress. *Id.* Ms. Noonan indicated Plaintiff had limited her work to 18 hours per week. *Id.* She noted that Plaintiff's blood glucose log revealed more incidents of high blood glucose and that her lowest readings were between 50 mg/dL and 68 mg/dL. *Id.* Plaintiff complained of numbness, burning, and tingling in her toes. *Id.* Ms. Noonan observed Plaintiff to have a tremor in her bilateral hands that was worsening. Tr. at 644.

---

[5] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

She stated Plaintiff's hypoglycemia had improved and that she was continuing to lose weight. *Id.*

On October 18, 2015, Plaintiff reported left temporal headaches and left occipital pain that radiated from her neck to her head. Tr. at 514. She denied recent syncopal episodes. *Id.* Dr. Baxley stated that Plaintiff's bereavement symptoms were slowly improving. *Id.* He indicated Plaintiff continued to experience fluctuations in her blood sugar and had unintentionally lost 30 to 40 pounds. *Id.* He observed Plaintiff to have decreased sensation distally and in the right median nerve distribution and to have 4/5 strength. *Id.* He noted no edema in Plaintiff's extremities, but tenderness at her left C1-2 paraspinal. *Id.* He diagnosed migraine headaches, chronic peripheral neuropathy secondary to diabetes, left occipital neuralgia, and a history of syncope that was likely secondary to blood sugar fluctuation. *Id.* He administered injections to Plaintiff's left occiput and temporal regions. *Id.*

      C.     The Administrative Proceedings

          1.     The Administrative Hearing

             a.     Plaintiff's Testimony

At the hearing on November 6, 2015, Plaintiff testified that she was 4' 8½" tall and weighed 139 pounds. Tr. at 49. She stated she had been diagnosed with diabetes in 2008 and required five insulin shots per day. Tr. at 54. She indicated her diabetes caused blurred vision. Tr. at 55. She claimed her blood sugar often fluctuated. *Id.* She stated episodes of low blood sugar were characterized by weakness, stomach upset, and occasional vomiting. *Id.* She described constant symptoms of burning, tingling,

numbness, and stabbing secondary to diabetic neuropathy that affected her feet, legs, hands, and arms. Tr. at 56. She claimed the pain in her feet was exacerbated by standing for long periods. Tr. at 59–57. She indicated symptoms of neuropathy in her hands sometimes caused her to drop items. Tr. at 57–58.

Plaintiff reported breathing problems associated with asthma and emphysema. Tr. at 58. She indicated she experienced rapid breathing and shortness of breath when she engaged in prolonged walking or was excited. *Id.* She described asthma attacks that occurred "from time to time" and would last from five to 15 minutes. Tr. at 58–59. She denied having experienced an asthma attack while working in her current job. Tr. at 59.

Plaintiff endorsed lower back pain that was associated with arthritis, a bulging disc, and a nerve problem. *Id.* She described her pain as radiating up her back and progressively worsening. *Id.* She claimed she was no longer able to stoop and bend as she had in the past. *Id.* She indicated she experienced numbness in her back if she attempted to bend for longer than five minutes. Tr. at 59–60. She stated increased activity increased her back pain. Tr. at 60. Plaintiff reported pain in her bilateral hips, but indicated the pain in the right hip was worse than the left. *Id.* She endorsed pain in the lower part of her neck that radiated to the left side of her head. Tr. at 61. She stated she had constant daily pain in her head and experienced migraines at least once a month. *Id.* She claimed that her migraines required she be in a quiet, dark room and apply cold washcloths to her head and neck. Tr. at 62. She stated her migraines caused vomiting that she sometimes took medication to control. *Id.* She indicated she tried to avoid visiting the hospital for migraines, but would go if the migraine did not improve within 24 hours after taking

prescribed medications. *Id.* She stated her migraines had caused her to leave work in the past. Tr. at 62–63.

Plaintiff stated she took four 10-milligram Lortab pills per day for pain and Gabapentin for neuropathy. Tr. at 70. She indicated she took Ultram and Sumatriptan for migraines. Tr. at 62. She confirmed that she also took Cymbalta for depression. Tr. at 69.

Plaintiff testified that she had experienced some psychological problems following her husband's death and was hospitalized for suicidal ideation. Tr. at 63. She denied additional hospitalizations, but indicated she had subsequently received treatment at Oconee Mental Health. Tr. at 64. She claimed her anxiety medications were helpful, but that she continued to feel jittery, nervous, and depressed. Tr. at 64–65.

Plaintiff testified that she had attended adult education courses for two to two-and-a-half years as she attempted to obtain a high school equivalency certificate. Tr. at 49. She stated she had failed the test two or three times. *Id.* She indicated she could read and write "[t]o a certain extent," but had difficulty with some words. *Id.*

Plaintiff testified that she continued to be employed by Foothills Assisted Living as a patient care assistant. Tr. at 50. She indicated her job duties included bathing the facility's residents, aiding them with meals, helping them to select their clothes, assisting them in dressing, and cleaning up after them. Tr. at 50–51. She confirmed that her job required her to be on her feet most of the time, but allowed her opportunities to sit, as well. Tr. at 51. She indicated she sometimes had to lift patients, but only did so with assistance. Tr. at 66. She stated her coworkers often completed the more physical aspects of her job duties. Tr. at 65–66. She indicated she had approached her supervisor in

February 2015 to request that her hours be reduced because she was no longer able to meet the physical and emotional demands of her job for more than four hours at a time on a couple days per week. Tr. at 66. She testified that she had worked a maximum of 16 hours and a minimum of four hours per week since February 2015. Tr. at 66–67.

Plaintiff indicated her daughter lived next door and would assist her in cleaning showers and toilets, washing dishes, cooking, sweeping, and mopping. Tr. at 67. She claimed she was able to dust and to microwave meals on her own. *Id.* She stated she continued to work part-time because it helped her mental state and provided income. Tr. at 67–68. She indicated she was unable to work more than 16 hours per week. Tr. at 68.

### b.     Vocational Expert Testimony

Vocational Expert ("VE") Robert E. Brabham, Sr., Ph.D., reviewed the record and testified at the hearing. Tr. at 70–83. The VE categorized Plaintiff's PRW as a nursing assistant, *Dictionary of Occupational Titles* ("*DOT*") number 355.674–014, as having a specific vocational preparation ("SVP") of four and requiring medium exertion[6]; a cashier and dining cafeteria attendant, *DOT* number 311.677-010, as having an SVP of two and requiring light exertion; a dog catcher, *DOT* number 379.673-010, as having an SVP of three and requiring medium exertion[7]; a sewing machine operator, *DOT* number 787.682-066, as having an SVP of three and requiring light exertion; and a hand packer, *DOT* number 920.587-018, as having an SVP of two and requiring medium exertion. Tr.

[6] The VE testified that the job of nursing assistant could reasonably be performed at the very heavy exertional level because it sometimes involved lifting patients. Tr. at 72.
[7] The VE stated the job of dog catcher could reasonably be performed at the heavy exertional level because dogs could weigh up to 100 pounds. Tr. at 73.

at 72–73 and 75. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that required she lift, carry, push, and/or pull 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk for six hours each in an eight hour workday; balance, be exposed to unprotected heights and moving mechanical parts, and climb ladders, ropes, or scaffolds occasionally; and be exposed to dust, odors, fumes, and other pulmonary irritants frequently. Tr. at 77. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a cashier and dining cafeteria attendant. *Id.* The ALJ asked whether there were any other jobs that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as a gasket inspector, *DOT* number 739.687-102, with 200,000 positions; a surgical-dressing maker, *DOT* number 689.685-130, with 400,000 positions; and a packing-line worker, *DOT* number 753.687-038. Tr. at 78–79.

The ALJ next asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited to sedentary work that required she lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently; sit for six hours in an eight-hour day; stand and/or walk for two hours each in an eight-hour day; balance, be exposed to unprotected heights and moving mechanical parts, and climb ladders, ropes, or scaffolds occasionally; and be exposed to dust, odors, fumes, and other pulmonary irritants frequently. Tr. at 79. He asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE stated that she would not. *Id.* The ALJ asked if the individual would be able to perform other work. *Id.* The VE testified that the individual could perform sedentary jobs with an SVP of two as a medical products assembler, *DOT*

number 739.687-086, with 80,000 positions; a packager, *DOT* number 589.687-014, with 200,000 positions; and a label cutter, *DOT* number 585.685-062, with 40,000 positions. Tr. at 80.

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the first question, but to further assume that she was limited to performing simple, routine tasks. Tr. at 80–81. He asked if the individual would be able to perform Plaintiff's PRW. Tr. at 81. The VE testified that the individual would be able to perform Plaintiff's PRW as a cashier and dining cafeteria attendant, as well as the other jobs identified in response to the first hypothetical question. Tr. at 81–82.

For a fourth hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the third hypothetical question, but would be off task for 20 percent of an eight-hour workday. Tr. at 83. The VE stated that the restriction was not addressed in the *DOT*, but that it was his opinion that it would be equivalent to four absences per month and would eliminate all employment. *Id.*

### 2. The ALJ's Findings

In his decision dated January 5, 2016, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.
2.  The claimant has not engaged in substantial gainful activity since February 22, 2015, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: migraines, diabetes mellitus, peripheral neuropathy, asthma/chronic obstructive pulmonary disease (COPD), affective disorder, anxiety disorder, and obesity (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit , stand, and/or walk for six hours each in an eight-hour day; push and pull as much as she can lift and/or carry; occasionally climb ladders, ropes, and scaffolds; occasionally balance; occasionally work in an environment at unprotected heights and exposure to moving mechanical parts; frequently be in an environment with exposure to dust, odors, fumes, and pulmonary irritants; and is limited to performing simple, routine tasks.

6.    The claimant is capable of performing past relevant work as a cashier and dining cafeteria attendant. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2013, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 16–28.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in relying on testimony from the VE that conflicted with the *DOT* to support the existence of jobs that Plaintiff could perform;

2)    the Appeals Council erred in declining to remand the case to the ALJ for consideration of new evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[8] (4) whether such

---

[8]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[9] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[9] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Conflict Between *DOT* and VE Testimony

Plaintiff argues that a conflict exists between the VE's testimony and the *DOT*'s descriptions of the identified jobs. [ECF No. 10 at 22]. She maintains that the restriction in the RFC assessment to simple, routine tasks conflicts with the *DOT*'s indication that all four jobs have a general educational development ("GED") reasoning level of two. *Id.* at 23. She contends the ALJ erred in relying on the jobs the VE identified without having resolved the apparent conflict between his testimony and the information contained in the *DOT*. *Id.* at 24.

The Commissioner argues the court should reject Plaintiff's argument because her counsel did not question the vocational expert about the conflict between the *DOT* and the VE's testimony. [ECF No. 11 at 4]. She maintains that Plaintiff's reliance on *Henderson v. Colvin*, 643 F. App'x 273 (4th Cir. 2016), is misplaced because she was not specifically restricted to one- and two-step instructions like the plaintiff in that case. *Id.* at 4–5.

At step five in the sequential evaluation process, "the Commissioner bears the burden to prove that the claimant is able to perform alternative work." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015), citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The Social Security Administration ("SSA") relies primarily on the *DOT* "for

information about the requirements of work in the national economy, and ALJ's should take administrative notice of information contained therein and consider it in assessing claimants' abilities to perform specific jobs. 20 C.F.R. § 404.1566(d). In some cases, ALJs obtain testimony from VEs to address more complex issues, such as whether claimants' work skills can be used in other work and specific occupations that allow for use of particular skills. 20 C.F.R. § 404.1566(e).

In recognizing that opinions from VEs sometimes conflict with the information contained in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved. The "purpose" of SSR 00-4p "is to require the *ALJ* (not the vocational expert) to '[i]dentify and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the *Dictionary*, and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.'" *Pearson*, 810 F.3d at 208, citing SSR 00-4p (emphasis in original). Pursuant to SSR 00-4p, "[f]irst, the ALJ must '[a]sk the [vocational expert] . . . if the evidence he or she has provided conflicts with the information provided in the [*Dictionary*]'; and second, '[i]f the [vocational expert]'s . . . evidence appears to conflict with the [*Dictionary*],' the ALJ must 'obtain a reasonable explanation for the apparent conflict.[10]'" *Id.* at 208, citing SSR 00-4p. "SSR 00-4p directs the ALJ to 'resolve the conflict by determining if the explanation given by the [expert] is reasonable'" and "to 'explain the resolution of the

---

[10]  The court explained that an "apparent conflict" existed when the VE's testimony "seems to, but does not necessarily, conflict with the *Dictionary*." *Pearson*, 810 F.3d at 209. ALJs must resolve both obvious and apparent conflicts between the VE's testimony and the *DOT*. *Id.*

conflict *irrespective of how the conflict was identified.*'" *Id.* at 208, citing SSR 00-4p (emphasis in original). Thus, "[t]he ALJ independently must identify conflicts between the expert's testimony and the *Dictionary.*" *Id.* at 209. Furthermore, "an ALJ has not fully developed the record if it contains an unresolved conflict between the VE's testimony and the *DOT*" and "an ALJ errs if he ignores an apparent conflict on the basis that the VE testified that no conflict existed." *Henderson*, 643 F. App'x at 277, citing *Pearson*, 810 F.3d at 210.

In the instant case, the ALJ determined that Plaintiff was "limited to performing simple, routine tasks." Tr. at 19. He relied on the VE's testimony to find that Plaintiff could perform jobs as a cashier and dining cafeteria attendant, *DOT* number 311.677-010[11]; a production inspector, *DOT* number 739.687-102; a machine operator/tester, *DOT* number 689.685-130; and a packer/packager, *DOT* number 753.687-038. Tr. at 26–27. Review of the *DOT*'s descriptions for each of these jobs reveals a GED reasoning level of two. *See* 311.677-010, CAFETERIA ATTENDANT. *DOT* (4th ed., revised 1991), 1991 WL 672694; 739.687-102, GASKET INSPECTOR, *DOT* (4th ed., revised 1991), 1991 WL 680198; 689.685-130, SURGICAL-DRESSING MAKER, *DOT* (4th ed., revised 1991), 1991 WL 678409; 753.687-038, PACKING-LINE WORKER, *DOT* (4th ed., revised 1991), 1991 WL 680354.

The Fourth Circuit addressed a conflict between the GED reasoning level and VE testimony in a recent unpublished opinion. In *Henderson*, 643 F. App'x at 277, the court

---

[11] In her brief, Plaintiff erroneously cited the *DOT* number for her PRW as a nursing assistant. *Compare* ECF No. 10 at 23, *with* Tr. at 26. The undersigned has considered the *DOT* number the ALJ cited for the job of cashier and dining attendant in his decision.

explained that "[u]nlike GED reasoning Code 1, which requires the ability to '[a]pply commonsense understanding to carry out simple one-or-two-step instructions,' GED Reasoning Code 2 requires the employee to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" *Id.*, citing *DOT*, 1991 WL 688702 (2008); *Rounds v. Comm'r*, 807 F.3d 996, 1003 (9th Cir. 2015) (holding that reasoning code two requires additional reasoning and understanding above the ability to complete one-to-two step tasks). The court acknowledged that "there is an apparent conflict between an RFC that limits [a claimant] to one-to-two step instructions and GED reasoning Code 2, which requires the ability to understand detailed instructions." *Id.* Accordingly, the court found that the ALJ failed to meet his burden at step five because the VE's testimony did not provide substantial evidence to show that the plaintiff's RFC would allow him to perform work that existed in significant numbers. *Id.* at 277; *see also Pearson*, 810 F.3d at 207–10.

The instant case is similar to *Henderson* in that the RFC assessment involved a restriction to simple tasks, but it differs from *Henderson* in that Plaintiff was not restricted to one-to-two step instructions.

The Commissioner cites the nonbinding cases of *Dardozzi v. Colvin*, 2016 WL 6085883 (D. Md. Oct. 18, 2016) and *Roundtree v. Berryhill*, 2017 WL 398368 (E.D.N.C. Jan. 30, 2017), to support her argument that other courts in the Fourth Circuit have found no apparent conflict between GED reasoning level two and simple, routine tasks. However, the court recently rejected a similar argument in *Piner v. Berryhill*, No. 3:17-

TMC-SVH, 2017 WL 4712084, at *14, adopted by 2017 WL 4682004 (D.S.C. Oct. 18, 2017).

In *Piner*, the court considered the same restriction to simple, routine tasks that the ALJ included in the RFC assessment in the instant case. *Id.* at 13. The court noted that it had issued prior decisions finding that an apparent conflict existed between GED reasoning level two and a restriction to simple, routine, repetitive tasks. *Id.* at 14, citing *Christopherson v. Colvin*, No. 6:15-4725-JMC-KFM, 2016 WL 7223283, at *9 (D.S.C. Nov. 18, 2016) (holding that an apparent conflict between the VE's identification of jobs having GED reasoning levels of two and three and an RFC that limited the plaintiff to "simple, routine, and repetitive tasks"); *Pressley v. Berryhill*, No. 8:16-2716-BHH-JDA, 2017 WL 4174780, at *10–11 (D.S.C. Aug. 24, 2017), adopted by 2017 WL 4156460 (D.S.C. Sept. 19, 2017) (finding that an apparent conflict existed between the jobs the VE identified in response to the hypothetical question that restricted the plaintiff to simple, routine, and repetitive tasks and the *DOT*'s description of the jobs as having GED reasoning levels of two and three). In addition, the court noted that the information in the *DOT* addressing GED reasoning levels suggested that an apparent conflict existed between GED reasoning levels two and three and a restriction to simple, routine tasks. *Piner*, 2017 WL 4712084, at *14. Pertinent to the instant case, "jobs with a GED reasoning level of one require workers to '[a]pply commonsense understanding to carry out simple one- or two-step instructions' and '[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job,'" and "[j]obs with a GED reasoning level of two require workers to '[a]pply commonsense

understanding to carry out detailed but uninvolved written or oral instructions' and '[d]eal with problems involving a few concrete variables in or from standardized situations.'" *Id.* at *14, citing *DOT*, 1991 WL 688702 (2016). The court stated as follows in comparing the restriction in the RFC assessment to the information in the *DOT*:

> The RFC assessment appears to be more consistent with GED reasoning level one than two or three because the abilities to perform simple tasks and to make simple work-related decisions in the RFC assessment are similar to the provision for applying commonsense understanding to carry out simple instructions at GED reasoning level one . . . The need for routine tasks in the RFC assessment is also consistent with the provision for standardized situations at GED reasoning level one . . . In contrast, the *DOT*'s descriptions of GED reasoning levels two and three indicate these jobs require more detail and variables than the RFC assessment describes.

*Id.* Because the instant case concerns the same restriction in the RFC assessment as *Piner* and the ALJ similarly relied on the VE's testimony to find that Plaintiff could perform jobs with a GED reasoning level of two, the undersigned is constrained to find that an apparent conflict existed.

The Commissioner cites cases from the Third and Fifth Circuit to support her argument that Plaintiff cannot raise the conflict between the GED reasoning level in the *DOT* and the VE's testimony because her counsel neglected to question the VE about the conflict during the hearing. ECF No. 11 at 4, citing *Carey v. Apfel*, 230 F.3d 131, 146–47 (5th Cir. 2000); *Zirnsak v. Colvin*, 777 F.3d 607, 619 (3d Cir. 2014). However, the Fourth Circuit has maintained that the burden at step five rests solely on the Commissioner and cannot be shifted back to the claimant. *Pearson*, 810 F.3d at 210, citing *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) ("[The claimant] was not required to raise th[e conflict] at the hearing, because the Ruling places the burden of making the

necessary inquiry on the ALJ."); *Haddock v. Apfel*, 196 F.3d 1084, 1090 (10th Cir. 1999) (stating that requiring the claimant to elicit testimony regarding a conflict "would amount to shifting the burden" of proof "back to the claimant"). Therefore, the undersigned rejects the Commissioner's argument.

In light of the foregoing, the ALJ erred in relying on the VE's testimony without resolving the apparent conflict between it and the GED reasoning levels of the jobs he identified. Therefore, the undersigned recommends the court find that substantial evidence does not support the ALJ's reliance on the identified jobs to meet the Commissioner's burden at step five.

2.     New Evidence Submitted to Appeals Council

Plaintiff submitted opinions from Drs. Baxley and Dillman to the Appeals Council. Tr. at 658 and 663.

In a statement dated March 21, 2016, Dr. Baxley indicated he started seeing Plaintiff in January 2012 and continued to treat her for migraines, neuropathy, and occipital neuralgia. Tr. at 663. He stated he had observed Plaintiff while she was experiencing migraines and noted that she had exhibited photophobia, phonophobia, malaise, and nausea. *Id.* He indicated that Plaintiff was experiencing migraines on an "almost daily" basis when she initiated treatment, but continued to have them once or twice per week. *Id.* He stated Plaintiff "would have easily missed well over 3 days of work per month just on the basis of her migraines." *Id.* He noted that Plaintiff's diabetic neuropathy had caused her to have no reflexes and diminished sensation distally in her legs and feet. *Id.* He indicated Plaintiff's balance was impaired and she had "a significant

tendency to fall." *Id.* He stated Plaintiff would be limited to "no more than a sedentary job" for safety reasons, but that she would not be able to sit long enough to perform a seated job because of pain in her legs. *Id.* He noted that Plaintiff experienced pain in the back of her head that was unrelated to her migraines. *Id.* He observed that Plaintiff's Tinel's sign was extremely tender over the greater trochanteric bursa. *Id.* He stated pain from migraines, occipital neuralgia, and neuropathy would frequently interrupt Plaintiff's concentration and ability to complete tasks throughout the workday. *Id.*

On September 9, 2016, Dr. Dillman stated he had treated Plaintiff since 2012 and had last seen her on April 7, 2016. Tr. at 658. He indicated Plaintiff's brittle diabetes with frequent episodes of hypoglycemia would be her "main problem with working." *Id.* He noted that Plaintiff had experienced significant anxiety since her husband's death and often presented as tearful and "wide eyed and jittery." *Id.* He stated Plaintiff's blood glucose level had been difficult to control despite her compliance with treatment. *Id.* He noted that Plaintiff had experienced fewer incidents of hypoglycemia since she initiated treatment with an endocrinologist, but had continued to experience weekly episodes. *Id.* Her hypoglycemic episodes would require that Plaintiff rest away from the work station until her blood glucose level returned to normal. *Id.* He indicated Plaintiff had peripheral neuropathy in her hands that was confirmed through positive Tinel's and Phalen's signs and mild atrophy of the thumb muscle. *Id.* He opined that Plaintiff's neuropathy would cause "difficulty with handling and keying or any kind of fine manipulation." *Id.* He noted that Plaintiff's back pain would necessitate that she change positions more often than once every 30 minutes. *Id.* He observed that Plaintiff did not appear to be focused

when she presented to his office, and he stated her conditions would frequently interrupt her concentration and ability to perform tasks throughout the workday. *Id.*

Plaintiff argues that the opinions from Drs. Baxley and Dillman were sufficiently material that they might have affected the ALJ's decision. [ECF No. 10 at 25]. She notes that Drs. Baxley and Dillman were her treating physicians and that the record before the ALJ contained no specific restrictions from a treating medical source. *Id.* at 27–28. She maintains that the Appeals Council erred in failing to remand the case for the ALJ to consider the new evidence. *Id.* at 25.

The Commissioner argues that the opinions from Drs. Baxley and Dillman are irrelevant because they did not relate to the period on or after the ALJ's hearing decision. [ECF No. 11 at 5]. She maintains that Dr. Baxley's treatment notes are inconsistent with his opinion to the extent that they reflect Plaintiff's reflexes to be normal and no evidence of paraspinal tenderness or abnormalities of the brain. *Id.* at 5–6. She contends that Dr. Baxley only examined Plaintiff on two occasions and his opinion was inconsistent with the other evidence of record. *Id.* at 6. She claims Dr. Dillman's opinion is duplicative because the ALJ previously considered his opinion that Plaintiff was disabled as being inconsistent with the evidence of record. *Id.* at 6.

If a claimant is dissatisfied with an ALJ's decision, she may request that the Appeals Council review it. 20 C.F.R. § 404.967. "The Appeals Council may deny or dismiss the request for review, or it may grant the request and either issue a decision or remand the case to an administrative law judge." *Id.* The Appeals Council will grant a claimant's request for review if:

(1)     There appears to be an abuse of discretion by the [ALJ];

(2)     There is an error of law;

(3)     The action, findings, or conclusions of the [ALJ] are not supported by substantial evidence;

(4)     There is a broad policy or procedural issue that may affect the general public interest; or

(5)     Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

20 C.F.R. § 404.970(a) (effective January 17, 2017).[12]

The Appeals Council will only consider additional evidence under paragraph (a)(5) if the claimant shows good cause for not informing the ALJ about or submitting the evidence prior to the hearing. 20 C.F.R. § 404.970(b) (effective January 17, 2017). If the Appeals Council finds that the additional evidence the claimant submitted was not new, material, or related to the period on or before the hearing decision or that the claimant did not have good cause for failing to submit it prior to the hearing, it will send the claimant "a notice that explains why it did not accept the additional evidence" and will advise her of her right to file a new application. 20 C.F.R. § 404.970(c) (effective January 17, 2017).

In the instant case, the Appeals Council specified that it had considered the opinions from Drs. Baxley and Dillman, but found their opinions did not provide a basis for changing the ALJ's decision. Tr. at 2 and 5. It noted that it was not accepting medical

---

[12] Because the Appeals Council issued its decision denying review on February 14, 2017, the most recent version of 20 C.F.R. § 404.970 is applicable. *See* Tr. at 1–7.

records from Seneca Medical Associates dated October 30, 2013, to October 29, 2015, because they were duplicates of evidence already in the record. Tr. at 2. It further indicated that it rejected records from Oconee Memorial Hospital dated March 28, 2016, to July 1, 2016, and Seneca Medical Associates dated January 7, 2016, because they concerned a later time and did not affect the decision as to whether Plaintiff was disabled beginning on or before January 5, 2016. *Id.*

The undersigned rejects the Commissioner's arguments that the medical opinions from Drs. Baxley and Dillman were not new and material and did not pertain to the period prior to the ALJ's decision. The undersigned notes that both physicians indicated that they had treated Plaintiff over a period of several years both prior to and subsequent to the ALJ's hearing decision and had observed the specified restrictions to be present during their courses of treatment.[13] *See* Tr. at 658 and 663. The court has interpreted the Fourth Circuit's decision in *Bird v. Commissioner of Social Sec. Admin.*, 699 F.3d 337, 345 (4th Cir. 2012), allowing for retrospective consideration of medical evidence created after a claimant's date last insured to situations in which the Appeals Council receives evidence created after the ALJ's hearing decision. *See Nix v. Colvin*, 2015 WL 799528, at *10 (D.S.C. Feb. 25, 2015), citing *Wise v. Colvin*, No. 6:13-2712-RMG, 2014 WL 7369514, at *6–7 (D.S.C. Dec. 29, 2014) and *Dickerson v. Colvin*, No. 5:12-33-DCN, 2013 WL 4434381, at *14 (D.S.C. Aug. 14, 2013). It has determined that "medical

---

[13] Although the physicians did not specify that the restrictions had been present since a particular date, the restrictions pertained to impairments and symptoms that were documented in Plaintiff's treatment records prior to the ALJ's hearing decision. *See generally* Tr. at 351–55, 387–431, 432–33, 514, and 530–601.

records from a later time period may be probative and relevant to establishing disability in an earlier time period if there is 'linkage' between the later treatment and the impairments at issue in the claimant's disability claim." *Bruton v. Berryhill*, No. 8:16-1006-RMG, 2017 WL 1449542, at *6 (D.S.C. Apr. 24, 2017), citing *Bird*, 699 F.3d at 340–41. Because the opinions from Drs. Baxley and Dillman pertained to the same impairments that the ALJ considered in his decision, there is linkage between their opinions and the period prior to the ALJ's decision.

Furthermore, the Appeals Council did not reject the opinions as not being new and material or pertaining to a later period. This is particularly noteworthy because the Appeals Council rejected other evidence as relating to the period after the ALJ's decision. *See* Tr. at 2. Instead of rejecting the opinions, the Appeals Council accepted them, included them in the record, and considered them in assessing whether the ALJ's decision was supported by substantial evidence. *See* Tr. at 2 and 5. Because the Appeals Council accepted the opinions and incorporated them into the record, the court must reject the Commissioner's argument that they did not meet the criteria for inclusion in the record. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Having established that the opinions from Drs. Baxley and Dillman were accepted by the Appeals Council as new, material, and related to the period on or before the ALJ's decision, the undersigned considers whether the Appeals Council erred in concluding that there was no reasonable probability that the opinions would have changed the outcome of

the ALJ's decision. *See* 20 C.F.R. § 404.970(a) (effective January 17, 2017). "In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the agency's decision where "substantial evidence support[ed] the ALJ's findings." *Meyer*, 662 F.3d at 707, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996). However, if a review of the record as a whole shows the new evidence supported the plaintiff's claim and was not refuted by other evidence, the court should reverse the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Secretary, Department of Health and Human Services*, 953 F.3d 93, 96 (4th Cir. 1991). If the addition of the new evidence to the record does not allow the court to determine whether substantial evidence supported the ALJ's denial of benefits, the court should remand the case for further fact finding. *Id.*

Although the Commissioner presents several arguments as to why the opinions from Drs. Baxley and Dillman did not warrant remand, the undersigned is not persuaded that substantial evidence supports the ALJ's decision with their inclusion. Plaintiff points out that that the record before the ALJ was devoid of an opinion from Dr. Baxley and contained no functional limitations from Dr. Dillman.

In *Meyer*, 662 F.3d at 706, the court noted that "[i]n view of the weight afforded the opinion of a treating physician, *see* 20 C.F.R. § 404.1527(d)(2),[14] analysis from the Appeals Council or remand to the ALJ for such analysis would be particularly helpful when the new evidence constitutes the only record evidence as to the opinion of the treating physician." The court found that remand was appropriate in the case because the ALJ had emphasized that the record lacked "restrictions placed on the claimant by a treating physician," which suggested that an "evidentiary gap played a role" in the decision. *Id.* at 707.

While the ALJ considered a prior opinion from Dr. Dillman, he cited Dr. Dillman's failure to "specify the claimant's functional limitations" as one reason for giving his opinion "little weight." Tr. at 24. In light of the regulatory emphasis on treating physicians' opinions and the ALJ's indication that the absence of specific restrictions from Dr. Dillman created an evidentiary gap, the new evidence could have reasonably changed the outcome of the ALJ's decision. Therefore, the undersigned recommends the court find the Appeals Council erred in declining to remand the case to the ALJ for consideration of the new evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based

---

[14] The text cited by the court in *Meyer* was reclassified as 20 C.F.R. § 404.1527(c) in later versions of the regulation. *Compare* 20 C.F.R. § 404.1527(d) (effective June 13, 2011 to March 25, 2012), *with* 20 C.F.R. § 404.1527(c) (effective August 24, 2012 to March 26, 2017), *and* 20 C.F.R. § 404.1527(c) (effective March 27, 2017).

on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

December 6, 2017                                    Shiva V. Hodges
Columbia, South Carolina                           United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).